UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLANTE & MORAN, PLLC, <br><br> Plaintiff, <br><br> v. <br><br> ANDOVER HEALTHCARE, INC., <br><br> Defendant. | Civil Action No. 17-10093-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                              November 13, 2018

**I.     Introduction**

Plaintiff Plante & Moran, PLLC ("PM") has filed this lawsuit against Defendant Andover Healthcare, Inc. ("Andover"), alleging breach of contract (Count I), breach of implied contract (Count II), breach of oral contract (Count III), unjust enrichment (Count IV), account stated (Count V) and quantum meruit (Count VI).  D. 1.  Following this Court's order partially allowing PM's motion to dismiss, D. 29, Andover's surviving counterclaims include breach of contract (Count I) and unfair and deceptive acts in violation of Mass. Gen. L. c. 93A, §§ 2, 11 ("Chapter 93A") (Count IV).  D. 5 at 6-9.  PM now moves for summary judgment as to Counts I-IV, Count VI and Andover's counterclaims.  D. 30.  Andover moves to strike PM's supporting affidavits.  D. 37-3; D. 37-4.  For the reasons stated below, the Court ALLOWS IN PART and DENIES IN PART PM's summary judgment motion, D. 30, and DENIES Andover's motions to strike, D. 37-3; D. 37-4.

1

## II. Standard of Review

### A. Summary Judgment

"Summary judgment is properly granted if the movant can demonstrate that 'there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 69 (1st Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue is one that can 'be resolved in favor of either party' and a material fact is one which 'has the potential of affecting the outcome of the case.'" Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). If the movant meets its burden, the non-moving party "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997). In conducting this inquiry, the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### B. Motions to Strike Affidavits

Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The "requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001). At summary judgment, the Court "may take into account any material that would be admissible or usable at trial," and

2

"inadmissible evidence may not be considered." Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993). "A motion to strike is the appropriate means of objecting to the use of affidavit evidence on a motion for summary judgment" and if the Court finds only certain portions of an affidavit inadmissible, the Court will disregard only those portions and consider the rest of it. Facey v. Dickhaut, 91 F. Supp. 3d 12, 19-20 (D. Mass. 2014).

## III. Factual Background

The following facts are drawn primarily from the parties' statements of material facts, D. 32; D. 37-1, and are undisputed unless otherwise noted.

Andover manufactures medical products, such as cohesive elastic bandages. D. 37-2 at 6-8. PM is a consulting firm based in Michigan. D. 1 ¶ 1. Andover and PM entered into three written contracts between late July 2015 and December 2015. D. 32 ¶¶ 1-53; D. 33-2; D. 33-6; D. 33-9. The first contract, signed August 5, 2015, was a flat fee agreement and is not at issue here. D. 32 ¶ 7; see D. 1 ¶¶ 54-89; D. 5 ¶¶ 10-12, 15-16. This contract was entered into by Thomas Murphy, founder and president of Andover, and Phillip C. Brown, a partner at PM, D. 32 ¶ 3; D. 35 ¶¶ 2-4; D. 37-1 ¶ 2; D. 37-2 at 10, and provided that Andover would pay PM $35,000 for a three-day period of consulting services, plus expenses. D. 32 ¶¶ 4-5. See D. 33-3. PM billed Andover the $35,000 on August 17, 2015, D. 33-4, which Andover paid. D. 32 ¶¶ 6, 8.

### A. The Second Contract

On September 11, 2015, the parties entered into a second contract, under which PM agreed to perform initial support services related to Andover's Master Validation Plan ("MVP"), including "deploying, training, coaching and performing validation of manufacturing and test equipment and processes," D. 33-6 at 5. D. 32 ¶¶ 10-11; D. 37-1 ¶ 1. The second contract, like the first, was signed by Murphy on Andover's behalf and Brown on PM's behalf. D. 32 ¶¶ 12-13; D. 35 ¶¶ 5-6; D. 37-1 ¶ 2. The second contract "was for six weeks of work," D. 32 ¶ 14; D. 37-1

3

¶ 3; D. 33-6 at 10, and states that the "core project team will consist of two team members participating in six visits to Andover Healthcare." D. 33-6 at 10. The contract page titled "Project Fees" breaks down "[e]stimated fees" as follows:

> Estimated fees are $100,000 for six weeks. Expenses will be billed at cost. Estimated fees are based on the following average hourly rates:
> Partner/Principal: $415
> Manager: $190
> Senior Consultant: $175

Id. On the next line of the same page, the contract states that "[a]fter the initial six weeks of work, Andover Healthcare and Plante Moran will determine whether additional support is needed for validation, and to what extent," to be "billed at the same rates noted above." Id. The same provision states that "[i]nvoices will be rendered as services are provided and are due when received. In the event an invoice is not paid timely, a late charge in the amount of 1.25% per month will be added, beginning 30 days after the date of the invoice." Id. Additionally, paragraph five of the contract addendum, labeled "Fee Quotes," states that "PM will endeavor to advise Andover Healthcare in the event" that unforeseen circumstances occur requiring PM to reschedule its work and impose additional fees, in accordance with the hourly rates provided and costs incurred, "however it is acknowledged that the exact impact on the Fee Quote may not be determinable until the conclusion of the engagement." D. 33-6 at 12.

After the six-week period specified in the second contract, the parties communicated about the services PM was providing. D. 32 ¶ 20; D. 37-1 ¶ 13; D. 33-6 at 10. PM contends that Andover then requested additional support for the MVP, relying upon an affidavit by William Morrison, Andover's Director of Operations and Quality at the time, in which Morrison asserts that he authorized PM to "devote additional time and resources to tasks included within the scope of the Second Contract," D. 34 ¶ 13. D. 32 ¶¶ 20-21, 25. Andover agrees that "[a]t the conclusion of the

4

Second Contract, the parties agreed to continue the work."[1] D. 37-1 ¶ 15; Cf. D. 37-1 ¶¶ 12-14. Andover contends, however—and PM does not dispute—that Brown, Murphy and other Andover employees spoke on a conference call in late October 2015, after the six week period, during which Brown failed to provide Andover with PM's fees up to that point. D. 37-1 ¶ 13. According to Brown's deposition, however, he did provide an estimate of the "hours that were expended, the rate for those hours, and travel that had been expended up to that point." D. 37-2 at 61. PM "maintains a billing system" by which each PM employee must log their time, which they are able to do remotely, and PM can access this system at any time. D. 37-1 ¶¶ 9-11.

Additionally, during the period covered by the second contract—the six weeks from mid-September to late October 2015—Murphy and Morrison requested services from PM outside the parameters of the second contract ("Initial Supplemental Services"). D. 32 ¶ 26. Andover contends that "there is considerable factual dispute about the amount of this work and about whether other work was inside or outside the scope of the Contracts," D. 37 at 9, relying upon Murphy's deposition testimony, in which he states that Morrison was not authorized to request such work on Andover's behalf, D. 37-2 at 21-34, and that certain tasks specified by PM as "additional services," see D. 32 ¶¶ 26(e)-(i), were actually "within the scope of the work" of the contract itself, D. 37-2 at 27-31.

The Initial Supplemental Services required an additional forty hours of work by PM. D. 32 ¶ 27. PM's work on the second contract, including the Initial Supplemental Services and the work conducted between October 25 and December 5, amounted to a total of over 600 hours of

---

[1] Andover moves to strike Morrison's affidavit on the basis that he lacks personal knowledge and is "not competent to testify as to the authority, if any, given to him by his employer." D. 37-3 at 1-3; see Fed. R. Civ. P. 56(c)(4). Andover provides no evidence to support its assertions. See D. 37-3 ¶¶ 1, 5-6, 11, 16-17. The Court thus DENIES Andover's motion to strike Morrison's affidavit, D. 37-3.

professional time. D. 32 ¶ 19; D. 35-1 at 5-6. Andover submits Murphy's affidavit here, in which he denies giving Morrison any actual authority to direct PM's work beyond the scope of any contract. See D. 37-2 at 22-27, 31. On February 9, 2016, PM provided Andover with an invoice associated with the second contract, including the Initial Supplemental Services, totaling $206,292.67, including $179,860.00 for professional services and $26,432.67 for expenses. D. 32 ¶ 29; D. 33-8; D. 37-1 ¶ 20. Andover has not paid any portion of this invoice. D. 32 ¶ 31.

### B. The Third Contract

About a month after the second contract's six-week term expired, on December 4, 2015, the parties entered into a third contract for services connected with implementing the MVP and training Andover personnel. See D. 32 ¶ 32; D. 37-1 ¶ 15. Murphy negotiated the contract with Brown and authorized Morrison to sign it on Andover's behalf. D. 32 ¶¶ 33-35; D. 37-1 ¶¶ 15-19. The third contract also contains a "Project Fees" section, this time providing that the "[e]stimated fees constituted "$82,500 for the engagement," with expenses "billed at cost." D. 33-9 at 10; D. 32 ¶ 38. The agreement includes a "core project team" of one partner (at an hourly rate of $425) for five days and a senior consultant (at an hourly rate of $175) for seven weeks—fifty hours per week—of site visits. D. 33-9 at 10. The hourly partner rate was "waived for Phillip Brown and to develop and conduct training [o]f [k]ey [p]ersonnel." Id.; see D. 32 ¶ 40. PM fully performed its services under the third contract and devoted about 225 hours to this work. D. 32 ¶¶ 41-42; see D. 35-1 at 7.

Sometime "[a]fter the execution of the Third Contract," Andover requested additional services and resources from PM ("Further Supplemental Services"). D. 32 ¶¶ 43-49; see D. 31 at 10. Andover sought PM's assistance in accelerating a new product's timeline, which required the work of one full-time consulting manager, one part-time consulting principal and Phillip Brown, whose services Andover specifically requested. D. 32 ¶¶ 43-47. Andover also requested certain

additional services, related to new products, equipment validation and audit readiness, which PM agreed to provide at its standard hourly rates. D. 32 ¶¶ 48-49. PM devoted approximately 886.75 hours in connection with the Further Supplemental Services. D. 32 ¶ 51; D. 35-1 at 8-9.

On February 9, 2016, on the same day that PM issued the second contract invoice, PM issued the third contract invoice, charging $410,198.26 for services rendered under the third contract. D. 32 ¶ 52; D. 33-10; D. 37-1 ¶ 21. Andover has not paid any portion of this amount. D. 32 ¶ 53. On May 10, 2016, PM provided Andover with a letter, drafted by Daniel Hoefle for PM, breaking down the invoice amounts for the outstanding invoices.[2] D. 32 ¶ 57; D. 35-1. On September 8, 2016, PM issued another invoice for expenses and costs incurred, totaling $27,233, which Andover has also not yet paid. D. 32 ¶¶ 54-55; D. 33-11; D. 37-1 ¶ 22.

## IV. Procedural History

PM instituted this action on January 20, 2017. D. 1. Andover filed its answer and counterclaims on May 4, 2017. D. 5. PM moved to dismiss Andover's counterclaims and strike its affirmative defenses, D. 9, which the Court allowed in part and denied in part, D. 29. PM now moves for summary judgment on all but one of its claims and all of Andover's remaining

---

[2] Andover moves to strike the portions of Brown's declaration attesting to the authenticity and accuracy of this letter, D. 35 ¶¶ 11-13, on the basis that Brown did not draft the letter and does not affirmatively state his personal knowledge of all facts in the letter, and the letter contains hearsay statements. D. 37-4. Andover does not dispute that the letter is a business record or that Brown is a qualified witness, see Wallace Motor Sales v. Amer. Motor Sales Corp., 780 F.2d 1049, 1061 (1st Cir. 1985) (noting a qualified witness "need not be the person who actually prepared the record"). See D. 37-4 at 1-2. Andover neither provides "specific facts showing that the records are unreliable or untrustworthy," Foregger v. Residential Credit Sols., Inc., No. 12-11914-FDS, 2014 WL 1364788, at *5 (D. Mass. Apr. 4, 2014), nor indicates which statements in the letter are allegedly hearsay, see D. 37-4 at 2. In fact, Andover has not disputed the facts contained therein, including the number of hours worked under each contract, see D. 32 ¶¶ 19, 51; D. 37-1, and has elsewhere confirmed that PM kept track of employees' work hours in the normal course, D. 37-1 ¶¶ 9-11. The Court is, therefore, unpersuaded that this letter would not be "admissible or usable at trial," Horta, 4 F.3d at 8, and thus and denies PM's motion to strike these portions of Brown's declaration, D. 37-4.

7

counterclaims, D. 30, and Andover moves to strike PM's supporting affidavits, D. 37-3; D. 37-4. The Court heard the parties on the pending motions and took the matter under advisement. D. 44.

## V. Discussion

### A. <u>**The Court Allows Summary Judgment as to PM's Breach of Contract Claim**</u>

As the Court has previously explained, D. 29 at 6, the second contract and third contract are governed by valid choice-of-law clauses, dictating that the contracts are governed by Michigan law, see D. 33-6 at 13; D. 33-9 at 13. The Court gives effect to the choice-of-law clause in these contracts. See, e.g., Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 194 (2013). Under Michigan law, a breach of contract claim requires that a claimant show "by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." Miller-Davis Co. v. Ahrens Constr., Inc., 495 Mich. 161, 178 (2014). "[U]nambiguous contracts are not open to judicial construction" and must be enforced "according to their unambiguous terms." Rory v. Cont'l Ins. Co., 473 Mich. 457, 468 (2005).

PM argues that the contract language unambiguously provides that Andover has an obligation to pay PM for services rendered pursuant to the contracts. D. 31 at 13. Andover does not dispute the validity of the contracts and that PM performed in accordance with the contracts, nor does it dispute the total hours PM contends it spent in doing so. See D. 32 ¶¶ 19, 51; D. 37 at 4-5. Rather, Andover argues that it never agreed to pay the amounts charged in the February 9 invoices, pointing to the language in the contract stating that the contract fees were "estimated" to be $100,000 and $82,500, and not the $206,292.67 and $410,198.26, respectively, that they were charged. D. 37 at 7-8. Even if Andover is correct that the "contract price[s]" for the second and third contracts were "approximately" the estimates contained therein, id., the undisputed facts demonstrate that Andover is still in breach: Andover did not pay the "contract price," or any amount, despite PM's performance under the contracts. D. 32 ¶¶ 31, 53. Andover argues that PM

8

was required to render timely invoices under the contracts.  D. 37 at 8.  As PM correctly points out, however, D. 38 at 13, the Court has previously rejected Andover's argument that the contract established this requirement.  D. 29 at 7.  Andover also argues that PM was "required under the Contract" to advise Andover of any "unanticipated change in the work or circumstances . . . caus[ing] some variance in the estimated fees."  D. 37 at 8.  PM points out, however, that the contract terms, do not require that PM do so within any particular timeframe, and that "Andover cannot feign surprise at the cost of Plante & Moran's services when Andover repeatedly asked Plante & Moran to perform additional work."  D. 38 at 13 (emphasis omitted).  Moreover, to the extent the contract established any such notice requirement—which the Court will discuss further below—Andover has not argued or demonstrated that PM's failure to do so excuses Andover's nonperformance under the contract or Michigan law.

It appears, therefore, that Andover's argument goes to the amount of damages at issue.  In a breach of contract action, the plaintiff bears the burden to prove damages with a reasonable degree of certainty, and a plaintiff "may recover only those damages that are the direct, natural, and proximate result of the breach."  <u>Van Buren Charter Twp. Visteon Corp.</u>, 319 Mich. App. 538, 550 (2017) (quoting <u>Alan Custom Homes, Inc. v. Krol</u>, 256 Mich. App. 505, 512 (2003)).  Here, the contracts explicitly provide that the fee amounts are "estimates," and that the final fee charged will depend upon the hours worked—at the rates provided for in the contracts—and expenses incurred by PM in performing its duties under the contracts. D. 33-6 at 10; D. 33-9 at 10.  PM has provided a breakdown of hours worked pursuant to contract performance, D. 35-1, the contents of which Andover does not dispute.  Excluding the work performed "outside of the scope" of the contracts—which PM calls the Initial Supplemental Services and Further Supplemental Services,

and the authorization of which Andover disputes, D. 37 at 9, PM's invoices spell out with a reasonable degree of certainty the remedy PM seeks.

The Court thus concludes that PM is entitled to summary judgment on its breach of contract claim as to the second contract and third contract.

> **B.    PM's Claims Regarding Initial Supplemental Services and Further Supplemental Services**

PM also moves for summary judgment as to its claims for breach of implied contract, breach of oral contract, quantum meruit and unjust enrichment as to the Initial Supplemental Services and Further Supplemental Services. D. 31 at 16-17. PM argues that Michigan law applies because the parties "expressly adopted the payment rates contemplated in the written contracts informing the implied and oral agreements." D. 31 at 16. Although choice-of-law provisions in a contract do not automatically apply to quasi-contract claims, see Dinan v. Alpha Networks, Inc., 764 F.3d 64, 69 (1st Cir. 2014), and the text of the choice-of-law provisions here are limited to the contracts themselves, D. 33-6 at 13; D. 33-9 at 13, it does not appear that Andover disputes that Michigan law governs these claims as well. See D. 37 at 9. Massachusetts applies a "functional choice of law approach," by which courts consider the following factors: "(a) the needs of the interstate and international systems, (b) the relevant policies of the form, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Bushkin Assocs. v. Raytheon Co., 393 Mass. 622, 632 (1985) (quoting Restatement (Second) of Conflict of Laws, § 6(2)). Here, Michigan and Massachusetts law and policy do not appear to conflict regarding the remaining claims, see Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004) (explaining

that "[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions"), and in the absence of a dispute by the parties that Michigan law applies, D. 31 at 16; see D. 37 at 9, the Court applies Michigan law to PM's remaining claims.

> 1.   *PM's Quasi-Contract Claims (Counts II, IV and VI)*

PM brings quasi-contract claims to recover for the Initial Supplemental Services and Further Supplemental Services it provided. See D. 31 at 16. Under Michigan law, "an implied contract, like other contracts, requires mutual assent and consideration." Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 456 (6th Cir. 2001) (quoting Spruytte v. Dep't of Corr., 82 Mich. App. 145, 147 (Mich. Ct. App. 1978)).

PM's remaining three counts lie in equity, and, therefore, in the alternative to PM's breach of contract claims as to the Initial Supplemental Services and Further Supplemental Services. See Morris Pumps v. Centerline Piping, Inc., 273 Mich. App. 187, 199 (Mich. Ct. App. 2006) (explaining that a claim for contract damages and a claim of quantum meruit "may be pleaded in the alternative and [] a plaintiff who has performed under a contract may elect between either of these two remedies"); Llewellyn-Jones v. Metro Prop. Grp., LLC, 22 F. Supp. 3d 760, 793 (E.D. Mich. 2014) (explaining that "[a]lternatively pleading an express contract and implied contract . . . is allowed when, for instance, there is a dispute between the parties as to whether an express agreement exists"). "The process of imposing a 'contract-in-law' or a quasi-contract to prevent unjust enrichment is an activity which should be approached with some caution. The essential elements of such a claim are: (1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain."[3] Dumas v. Auto Club Ins. Ass'n, 437

---

[3] The Court interprets PM's complaint and subsequent filings as pursuing a claim based upon an implied-in-law contract and not an implied-in-fact contract. Michigan draws a clear distinction

11

Mich. 521, 546 (1991) (internal quotation marks omitted). "The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment." NL Ventures VI Farmington, LLC v. City of Livonia, 314 Mich. App. 222, 241 (Mich. Ct. App. 2015). Under Michigan law, "[w]hether a specific party has been unjustly enriched is generally a question of fact." Morris Pumps, 273 Mich. App. at 193. Equitable remedies may also be available "where a legally enforceable contract exists between the parties [and] recovery is sought for extra-contractual performance." Terry Barr Sales, 96 F.3d at 181 (citing Cascade Elec. Co. v. Rice, 70 Mich. App. 420 (Mich. Ct. App. 1976)).

Andover does not dispute the existence of certain implied contracts. PM and Andover discussed PM's performance of additional services outside the scope of the written contracts, and PM performed these services. See D. 32 ¶¶ 26-28, 42-49; D. 37 at 9. Although Andover may dispute the amount of work PM performed or the amount owed for that work, it is undisputed that PM performed additional services and Andover declined to pay PM any amount in compensation. This resulted in the unjust enrichment of Andover at PM's expense. Cf. Morris Pumps, 273 Mich. App. at 197.

---

between the two: "[t]he first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law." Wrench LLC, 256 F.3d at 456 (quoting Cascaden v. Magryta, 247 Mich. 267, 270 (1929)). Although PM has not specified whether its claim pertains to an implied-in-fact or implied-in-law contract, PM's characterization of the claim as one that "lie[s] in quasi-contract and equity," analyzed under Michigan law in substantially the same manner as quantum meruit and unjust enrichment, D. 31 at 16 n.1, demonstrates its pursuit of a claim based upon implied-in-law contract. If PM asserted a breach of an implied-in-fact contract claim here, the Court would deny summary judgment for the same reasons addressed in the oral contract context: PM has failed to demonstrate as a matter of law a meeting of the minds as to the scope and terms of any implied contract governing the Initial and Further Supplemental Services.

The Court thus ALLOWS summary judgment as to PM's claims of breach of implied-in-law contract, quantum meruit and unjust enrichment for the Initial Supplemental Services and Further Supplemental Services.[4]

## C. Andover's Counterclaims

Andover's counterclaims following this Court's order on PM's motion to dismiss include a claim of breach of contract (Count I) and a claim that PM's actions constituted a violation of Chapter 93A (Count IV). D. 29 at 13. PM moves for summary judgment as to these counterclaims. D. 30 at 1. The Court addresses each in turn.

PM is entitled to summary judgment for Andover's breach of contract claim. The Court explained in its prior order that Andover stated a claim for breach of contract solely on the basis of PM's alleged failure to inform Andover that its fees would vary substantially from the estimates in the contract. D. 29 at 7-8. The contract provides that PM would "endeavor to advise Andover" of costs above fee quotes, D. 33-6 at 12; D. 33-9 at 12, and PM failed to inform Andover of its fees associated with the second and third contracts at any time prior to its February 2016 invoices. See D. 37-1 ¶¶ 9-14. The contracts recognize, however, that circumstances may arise that require adjustments to the fees from the estimates in the contracts and that "the exact impact on the Fee Quote may not be determinable until the conclusion of the engagement." D 33-6 at 10-11; D. 33-9 at 10-11. There is no basis upon which the Court may insert the word "timely" or any particular timeframe into the agreement. Both parties agree that the language of the contracts is unambiguous, D. 37 at 7; D. 38 at 12, but to the extent that Andover would base its claim upon any ambiguity in the word "endeavor," Andover has failed to produce any evidence suggesting

---

[4] In light of this ruling, the Court need not reach PM's motion as to the breach of oral contract (Count III) as to the Initial Supplemental Services and Further Supplemental Services and, therefore, DENIES summary judgment as to Count III as moot.

that the parties contemplated a timeliness component in agreeing that provision. Cf. August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992) (explaining that "to avoid summary judgment, [the nonmovant] must be able to point to specific, competent evidence to support its claim"). Additionally, as a factual matter, although PM did not provide an invoice for the second contract in October 2015, D. 37-1 ¶¶ 12-13, it is undisputed that Brown provided Andover with an estimate of the running totals of hours worked and expenses incurred up to that point, D. 37-2 at 61. Andover has produced no evidence to the contrary. PM is thus entitled to summary judgment as to Andover's breach of contract counterclaim.

Likewise, PM is entitled to summary judgment on Andover's Chapter 93A counterclaim, Mass. Gen. L. c. 93A, § 11. Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," id. § 2(a), and "[a]n action is 'unfair' if it is '(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [or] (2) immoral, unethical, oppressive, or unscrupulous.'" Gossels v. Fleet Nat'l Bank, 453 Mass. 366, 373 (2001) (quoting Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008)) (alteration in original). In the context of disputes among businesses, the "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979); see Zurich Am. Ins. Co. v. Watts Regulator Co., 796 F. Supp. 2d 240, 244 (D. Mass. 2011). "[W]hether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . ." Milliken, 451 Mass. at 563 (quoting Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 414 (1991)). Andover has provided no factual evidence supporting its Chapter 93A claim. Andover contends that "the Summary Judgment record shows that" PM failed to advise Andover of its substantial change in fees, despite knowledge that they were substantially higher than

estimated at least some time prior to entering into the third contract. D. 37 at 10. Andover's blanket reference to the record provides no actual identification of the deceptive acts at issue. As mentioned above, Andover was apprised of the hours worked and expenses incurred by Brown months before the invoice was sent, at the beginning of negotiations for the third contract, see D. 37-2 at 61, and Andover does not provide any evidence that Brown was dishonest or deceptive regarding this information.[5] Andover has failed to provide a record from which a reasonable finder of fact could conclude that PM's conduct was deceptive or unfair, especially at the level of "rascality" contemplated by 93A in the context of business disputes.

The Court thus ALLOWS PM's motion for summary judgment as to both counterclaims.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS in part and DENIES in part PM's motion for summary judgment, D. 30. PM's motion for summary judgment is ALLOWED as to PM's claims of breach of contract (Count I), breach of implied contract, as to implied-in-law contract (Count II), unjust enrichment (Count IV), quantum meruit (Count VI) and Andover's counterclaims, but it is DENIED as moot as to PM's claim of breach of oral contract (Count III). Andover's motions to strike certain of PM's affidavits, D. 37-3; D. 37-4, are DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[5] PM's prompt issuance of the first contract invoice also does not necessarily support Andover's Chapter 93A claim here. Although this invoice was timelier, it also pertained to a contract with a flat fee and fixed duration, as opposed to the second contract, which contained flexible fee and duration terms. Compare D. 33-3 at 9 with D. 33-6 at 10.